UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 20 CR 10 (CM)
Sentencing

HENRY VENTURA,

Defendant.

------------------------------x

New York, N.Y.
April 29, 2021
2:53 p.m.

Before:

HON. COLLEEN MCMAHON,

District Judge

APPEARANCES

AUDREY STRAUSS,
United States Attorney for the
Southern District of New York
BY: DANIEL G. NESSIM
Assistant United States Attorney

DAVID PATTON
FEDERAL DEFENDERS OF NEW YORK
Attorney for Defendant
BY: AMY GALLICCHIO

ALSO PRESENT: CRISTINA WEISZ, Spanish Interpreter

(In open court)

(Case called)

MR. NESSIM: Good afternoon, your Honor. Daniel Nessim for the government.

THE COURT: Good afternoon, Mr. Nessim.

MS. GALLICCHIO: Good afternoon, your Honor. The Federal Defenders by Amy Gallicchio for Mr. Ventura.

THE COURT: Thank you. Counsel, please stay seated. I'd like everyone to stay seated, use the microphone. Don't stand up. It's so much easier to hear.

Okay. Hang on a second. The matter is on for sentencing under docket number 20 CR 10, United States of America v. Henry Ventura. Mr. Ventura, having been found guilty by plea to one count of conspiracy to distribute and possess with the intent to distribute fentanyl, a lesser-included offense, in violation of 21, United States Code, Section 846.

This is a class B felony. It carries a mandatory minimum sentence of five years to a statutory maximum of 40 years' imprisonment, a mandatory minimum of four years to a statutory maximum of lifetime of supervised release, a fine of up to $5 million and a mandatory special assessment of $100.

In connection with today's proceedings, I have received and reviewed the presentence report prepared by United States Probation Officer Johnny Kim. It was filed with the

Court on April 1st, 2021.

I have also reviewed a sentencing memorandum from the United States Attorney's Office dated April 22, 2021, and a sentencing memorandum from the Office of Federal Defenders dated April 14, 2021. There are a number of letters that Ms. Gallicchio has attached to that submission.

Is there anything else I should have seen in writing prior to today's proceeding from the government?

MR. NESSIM: No.

THE COURT: From the defendant?

MS. GALLICCHIO: No, your Honor.

THE COURT: Has the government reviewed the presentence report?

MR. NESSIM: Yes, your Honor.

THE COURT: Any additions, deletions or corrections?

MR. NESSIM: No, your Honor.

THE COURT: Does the government wish to be heard on sentencing?

MR. NESSIM: Very briefly, your Honor. The government is seeking a guidelines sentence. Obviously, the offense in question, the defendant's involvement of trafficking a very large quantity of fentanyl, it is very serious. Here, the aggravating factors just heighten that severity.

His prior conviction to which he received a substantial sentence and also the possession of a loaded

firearm in connection with that drug trafficking and all of those factors together, the government views support the imposition of a guidelines sentence here.

THE COURT: Okay. Thank you.

Ms. Gallicchio, have you reviewed the presentence report?

MS. GALLICCHIO: Yes, your Honor.

THE COURT: Have you gone over it with your client?

MS. GALLICCHIO: Yes.

THE COURT: Any additions, deletions or corrections?

MS. GALLICCHIO: No, your Honor.

THE COURT: Then I'll hear you on sentencing.

MS. GALLICCHIO: Thank you, your Honor. Your Honor, first, I just want to recognize that present in the audience are two of my client's sisters, who wrote letters; an aunt, I believe who also wrote a letter; and I expect other siblings, sisters, may trickle in. And they are here in support, of course, of Mr. Ventura.

Your Honor, so I want to begin with, probably not surprisingly, the fact that Mr. Ventura has already been incarcerated under extremely difficult circumstances. For 18 months he's been incarcerated. For 12, 13, 14 months of that time has been during the pandemic and under lockdown. So he has survived the duration of the pandemic, and I know the Court is well aware of the conditions that our clients have been

subject to during the course of this pandemic --

THE COURT: Too well aware.

MS. GALLICCHIO: -- and has heard it many times. But it is a true and lived experience for so many, and we can't underestimate the severity of that experience, and I know the Court will not.

It has been for Mr. Ventura, of course. It has been traumatizing, terrifying, demoralizing, dehumanizing. I could go on. And the question is, what is it worth? Is it worth something? Is there a number? Is there a discount? Is there some credit he should get? And I think the answer is yes.

And I know the Court has recognized that, in other cases, and I don't know what the number is, but I think it should be significant because the impact has been significant, and so we hope that the Court will take that into consideration in determining the proper sentence here.

The guidelines in this case are extreme. They are, of course, driven, as the Court is well aware, by the weight of the drugs and, of course, my client's prior record. I do think that the Court, though -- I want to ask the Court to consider the nature of the prior conviction in this case that puts him -- that jacks up the guidelines in this case, to some extent.

It is a 2008 conviction, your Honor, almost 11 years before his arrest in this case, and it involves a narcotics

trafficking offense in the State of Massachusetts and which, according to the presentence investigation, my client's role was that of a money courier. Even in the presentence investigation, it's clear that the main target was someone else. So I think it's worthy to consider the nature of that prior conviction.

Regarding the instant offense, your Honor, in the government's letter they suggest that the Court should not credit Mr. Ventura's, what they call, self-serving, post-arrest claim that he was watching a stash and that was the extent of his involvement. But there's no evidence to the contrary that there was something else bigger going on with him.

By no means am I excusing the conduct or not suggesting that's not serious. Of course it is. Fentanyl is an extremely dangerous and serious drug, but it should be seen for what it is and not what we speculate it might be.

And then beyond the crime, your Honor, of course, is the man, and the Court has read the letters of support from his family. And clearly, this man is not irredeemable. He has survived a tough, a traumatic upbringing, replete with abuse, abandonment, poverty. And as his sisters write, quite honestly, in their letters, they think it explains why he's had some difficulty in his life. But they also believe in him, and they also support him. And they are truthful, and they tell it like it is. They recognize he's done something wrong. They're

not sugarcoating it. But they are prepared to help him in any way they can, once he is returned back to the Dominican Republic.

And of course, he will face deportation proceedings following his sentence in this case. They are a loving family, a supportive family. Despite the hardship they endured, the siblings are incredibly close and, of course, speak highly of their brother.

They all recognize that he must be punished, your Honor, but I would submit, as I've written in my letter, that given all the circumstances in this case, things I've outlined in the letter and what I've said here today, that five years in prison is certainly sufficient, not to mention the fact that this pandemic is still ongoing. The conditions of confinement have not changed, and he will continue to suffer under those conditions. So we ask the Court to consider our proposal of five years.

THE COURT: Okay. Anything else from the government?

MR. NESSIM: No, your Honor.

THE COURT: Mr. Ventura, anything that you'd like to say to me before I sentence you?

THE DEFENDANT: Yes, I would like to say something, your Honor. I would like to apologize to you, your Honor, to this country, to my family, to my children because during these 18 months and during this pandemic, I learned or reaffirmed how

much I'm wanted and loved.

It is not easy, what we are going through being in jail during the pandemic. Sometimes we were locked in a cell for ten, 12 days without hearing from our families. And when we are finally able to get in touch with our families, relatives, your heart is pumping just waiting for bad news, maybe a mother or any other relative could have died, or even our siblings or our children or a loved member of our family.

Also, we've gone through very difficult times, in addition to what I said, because of the gun that was brought into jail. And also, the cells we are in, we are never given the proper materials to clean it up. Yeah, there are cockroaches and there are rats. Sometimes you grab a can of soup to eat, and you can see that they've been gnawed by rats. And also, there are very frequent fires in that building.

But I also recognize that I do deserve a punishment, but I beg you to have consideration of me, your Honor. I know I'm going to be deported, but I also know that I come with the support of my family. I know I'm going to have to start from the bottom up again, but I know that I will be able to do that with my family's support. With my family's support and love, one can move forward when one desires so. This is all I want to tell you, that I'm sorry again. That's it.

THE COURT: Okay. Well, this represents the second time in the last three hours that I have sat through a lengthy

recitation from the mouth of a prisoner at the MCC about the deplorable conditions in that building, which I know to be true.

And I say on the record in this case what I said on the record in the last case, it was the greatest frustration of my term as chief judge, that I was absolutely incapable of getting anything changed over there. It is the result of mismanagement at the highest levels of the Bureau of Prisons. It is the result of allowing wardens to go through six months, three months, a year at a time. No one staying. No one invested in the institution or in reforming it. It is intolerable, and it is a national disgrace.

And I know for a fact, from talking to other judges in other districts, that while no jail is a very nice place, the MCC and the MDC are in the ninth circle of hell when it comes to conditions, and I'm tired of it.

And I am going to give Mr. Ventura, as I gave to my defendant earlier in the day, a significant amount of credit for having served in conditions that, as far as I am concerned -- and that's independent of the pandemic, because the pandemic nobody can do anything about, and in the pandemic, all of us have suffered, those of us on the outside, those of us on the inside.

I can't help that, but there are other conditions that are not pandemic related or unique to the pandemic that are as

intolerable as anything I've heard about in any Colombian prison, where I've been asked to ameliorate sentences because of the extraordinary conditions under which a defendant was being held.

In the case of Colombia, a foreign country, by an administration is not supposedly dedicated to what we are supposedly dedicated to, which is equal justice for all, a presumption of innocence to those who have not yet pleaded guilty or gone to trial, and humane treatment for those who are in prison.

I recognize that Mr. Ventura has suffered greatly, far in excess of what all prisons throughout the country have suffered as a result of the pandemic because of the vial conditions at the MCC.

I am, for that reason, not going to give him a guidelines sentence, which I would otherwise be disposed to give him because he is a recidivist and because he has come into the country illegally, after being deported. So we shouldn't have had to go through this at all. But he has been punished doubly for his sins during his period of incarceration, and I am going to recognize that in sentencing him. And I trust that he will be moved out of the MCC with alacrity and into another facility where, hopefully, things will be better.

I've reviewed the presentence report. I accept and

adopt as my findings its description of the events, the offense conduct. The calculation of the guidelines is correct. The total offense level is 33, defendant's criminal history category is II, and guidelines sentence is 151 to 188 months. But that sentence would be excessive, in view of the torture that the defendant has undergone in spending the last year and a half in the custody of the United States Bureau of Prisons, in the City of New York, under the watchful eye of the Department of Justice. Something must be done about this by someone who has the power to do it. I didn't.

All right. I accept and adopt as my findings the offender characteristics that are set out beginning at paragraph 41 of the presentence report.

The defendant's crime is serious. The defendant was not a minimal participant in this. The defendant is a recidivist, and the defendant was in this country illegally, after having been deported, for which, I believe, the sentence should be enhanced. So I'm not going to give him the mandatory minimum either. I'm going to give him 96 months.

I believe the section 3553(a) factors, and I conclude, consistent with a parsimony clause, that a sentence of 96 months is sufficient but not greater than necessary to achieve all of the goals of sentencing, including the goal of punishing the defendant for his crimes, recognizing the fact that the defendant had been deported for a prior crime and returned to

the United States and almost immediately began engaging in illegal activities again.

You may be very good to your family, sir, but you can't do it this way. You just can't. But it will provide just punishment, hopefully deterrence for this defendant, if not for anybody else.

Under docket number 20 CR 10, a total offense level of 33, criminal history category of II, I hereby sentence you, Henry Ventura, to be remanded to the custody of the Bureau of Prisons for a term of 96 months, to be followed by no supervised release because you're going to be deported.

Now, we judges were told yesterday that it might be advisable to sentence defendants who are going to be deported, notwithstanding the guidelines recommendation, to a period of supervised release because the current administration may not deport everyone who is convicted of a crime. I find it very hard to believe that the administration would not be deporting someone who has already been deported and come back into the United States illegally and committed another very serious drug crime. And I note that there is an ICE detainer on the defendant.

Recommendation for place of incarceration?

MS. GALLICCHIO: Within the New York City area, your Honor.

THE COURT: Well, what? The MCC, the MDC?

MS. GALLICCHIO: Certainly not, no. A place? Near New York City.

THE COURT: That's what we have available in New York City.

MS. GALLICCHIO: Understood. Certainly not a --

THE COURT: As close as possible to New York City, but not the MCC or the MDC, and that's to facilitate family visitation. Mr. Ventura does have a very deeply devoted family.

I'm not imposing a fine on Mr. Ventura. He has no ability to pay. Restitution is not applicable.

Is the government seeking forfeiture?

MR. NESSIM: Your Honor, the government has already administratively forfeited the money seized at the time of the defendant's arrest. Beyond that, we're not seeking forfeiture.

THE COURT: Okay. Then I don't have to worry about that.

Sir, you are required to pay court costs in the amount of $100. They'll be deducted from your prison wages at the rate of $25 per calendar quarter, or 50 percent of your gross monthly earnings if you are in a Unicor Grade One through Four program.

Okay. Was there an appeal waiver in this case?

MR. NESSIM: Yes, your Honor.

THE COURT: At what, 151 to 188?

MR. NESSIM: Yes.

THE COURT: Mr. Ventura, do you recall that at the time you took your plea of guilty, you also signed a letter of agreement with the government?

THE DEFENDANT: Yes.

THE COURT: In that letter, it says that if I sentence you to 188 months in prison or less, you would not take an appeal from your sentence, and you would not bring a lawsuit challenging the legality of your sentence. Do you recall that?

THE DEFENDANT: Yes.

THE COURT: Did your lawyer explain to you that if you signed the letter, you would be giving up your right to take an appeal as long as I didn't sentence you to more than 188 months?

THE DEFENDANT: Yes.

THE COURT: Did you sign the letter of your own free will?

THE DEFENDANT: Yes.

THE COURT: Okay. I've sentenced you to 96 months. That's less than 188 months, right?

THE DEFENDANT: Yes.

THE COURT: So it's my understanding that you have waived your right to take an appeal from your sentence. Is that also your understanding?

THE DEFENDANT: Yes.

THE COURT: You're very fortunate in your family, Mr. Ventura. I'm sorry that you're going to have to be physically separated from them first by prison and then again by deportation. But I hope that you and they will be successful in helping you to build a new life in the Dominican Republic when you are, once again, deported.

Now, I want to remind you that it is a crime to reenter the United States after being deported, unless you get the permission of the Attorney General of the United States. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. Is there anything else from the government?

MR. NESSIM: Yes, your Honor. The government moves to dismiss the underlying indictment.

THE COURT: Underlying indictment is dismissed. Thank you, Mr. Nessim.

Anything else, Ms. Gallicchio?

MS. GALLICCHIO: No, your Honor.

THE COURT: Okay. These proceedings are closed.

MR. NESSIM: Thank you, your Honor.

(Adjourned)